# STATE EX REL. LOUIS LaFOND AND OTHERS v. CITY OF MINNEAPOLIS AND OTHERS.[1]

February 24, 1928.

No. 26,484.

**Pensioner of Minneapolis cannot change his option without consent of retirement board.**

An employe of the city of Minneapolis entitled to a retirement allowance under the pension system provided for by L. 1919, c. 522, who, instead of electing to receive a retirement allowance payable only throughout his life, elects "to receive the actuarial equivalent at that time" of his retirement allowance "in a lesser retirement allowance," payable throughout life, must *on his retirement* select one of the first three options specified in § 9 of said chapter and cannot thereafter change from the one selected without the consent of the retirement board.

Municipal Corporations, 43 C. J. p. 908 n. 12 New.

Defendants appealed from a judgment in mandamus of the district court for Hennepin county, Montgomery, J. for the payment of $2,050.89 to relators as the heirs of Joseph LaFond pursuant to L. 1919, c. 522. Reversed.

*Neil M. Cronin,* City Attorney, and *Thomas B. Kilbride,* Assistant City Attorney, for appellants (respondents below).

*G. H. Smith* and *R. W. Peterson,* for respondents (relators below).

HOLT, J.

Appeal by defendants, the city of Minneapolis, the municipal pension and retirement board, and the members thereof, from a judgment in mandamus directing the payment of a certain sum of money to relators, the heirs of Joseph LaFond, an employe of the city who died after becoming a beneficiary under the provisions of L. 1919, p. 712, c. 522.

There is no dispute as to facts, which in short are these: Joseph LaFond had been an employe of the city of Minneapolis for over 25

[1]Reported in 218 N. W. 119.

years, when on January 2, 1923, he made written application to the board for retirement allowance under the law. He elected to take less than the full allowance, and nominated his wife to be the recipient of the allowance after his death as provided in option II of L. 1919, p. 712, c. 522, § 9. His wife died August 21, 1924, and on October 11 following he filed written notice with the board to change from option II to option I. This notice was signed by Joseph LaFond but not acknowledged. The board did not act upon the application until October 9, 1926, when it was denied. Meanwhile Joseph LaFond died, May 12, 1925. At that time, under the law as administered by the board, relators, if designated or nominated under option I when Joseph LaFond retired, would have been entitled to $1,795.49, the amount with interest the judgment awards.

The question presented by the appeal is: Can a pensioner under the law shift at will from one option to another after having made his election upon retirement from the service? We answer the question in the negative. The scheme and purpose of c. 522 must be kept in mind in construing the different provisions thereof. It will hardly do to view this law in the same light as we do annuity insurance policies or even mutual benefit insurance contracts. The fund created by this law is for the most part a pension fund created and maintained by public taxation. The only contribution the employe is required to make to this fund is two dollars per month, withheld from his wages. But as to this amount § 10 provides that, at any time before claiming a retirement allowance, the employe may quit the service and have the amount he had thus contributed, with accrued interest, refunded to him. So the city cannot count very greatly on lapsed premiums from employes to replenish or maintain the retirement fund. The act provides for the enforced retirement of both contributing and noncontributing employes and for disability allowances (§§ 4, 6). Section 3(o) states: "'Actuarial deficit or surplus' of an allowance or of allowances shall mean the difference between the estimated cost of said allowance or allowances and the actual cost thereof." And § 14 contains this: "Interest as provided for in this act and the payment of all pensions,

annuities, retirement allowances, refunds and death benefits granted by the retirement board under the provisions of this act are hereby made obligations of the city," and requires the board to prepare each successive year, prior to the last day of August, an itemized statement showing: (1) The aggregate present worth of all retirement allowances chargeable against the city on behalf of employes retired during the 12 months ending with the last day of June preceding; (2) the net aggregate of the amounts credited to the employes and charged the city during the preceding fiscal year; (3) the actuarial deficit or surplus for the preceding fiscal year; and (4) an estimate of administrative expenses of the board for the next fiscal year. The board of tax levy shall make an appropriation for the benefit of the retirement fund, and a tax shall be levied to meet such estimated requirements "increased or decreased, as the case may be, by the actuarial deficit or surplus for the preceding fiscal year." The proceeds of this annual tax shall be paid into the city treasury to the credit of the retirement fund, constituting a special fund to be used only for the payment of the obligations created under the act. The particular provisions here important are those of § 9 and read:

"At the time of his or her retirement any beneficiary may elect to receive his or her benefits in a retirement allowance payable throughout life or may on retirement elect to receive the actuarial equivalent at that time of his or her annuity, pension or retirement allowance in a lesser annuity, or a lessor pension, or a lesser retirement allowance, payable throughout life, with the provision that:

"Option I. If said beneficiary die before receiving in payments the present value of his or her annuity, pension, or retirement allowance, as it was at the time of his or her retirement, the balance shall be paid to his or her legal representatives or to such person, having an insurable interest in his or her life, as said beneficiary shall nominate by written designation duly acknowledged and filed with the retirement board at the time of retirement, or

"Option II. Upon the death of the beneficiary, his or her annuity, pension, or retirement allowance, shall be continued throughout the

life of and paid to such person, having an insurable interest in his or her life, as said beneficiary shall nominate by written designation duly acknowledged and filed with the retirement board at the time of retirement, or

"Option III.   Upon death of the beneficiary one-half of his or her annuity, pension, or retirement allowance shall be continued throughout the life of and paid to such person, having an insurable interest in his or her life, as said beneficiary shall nominate by written designation duly acknowledged and filed with the retirement board at the time of retirement, or

"Option IV.   Other benefit or benefits shall be paid the beneficiary or such other person or persons as said beneficiary shall nominate, provided such other benefit or benefits shall be certified by the executive secretary of the retirement board to be of equivalent actuarial value and shall be approved by the retirement board."

The title of the act, as well as its various provisions, shows its purpose to be retirement allowances to employes on reaching an age when efficiency and ability to earn a livelihood are about gone or where service disability has occurred.   It is not intended to provide for the heirs of the employes or to bestow a bonus upon their relatives.   Primarily the retirement allowance is designed for the employe as a life pension or annuity payable monthly, the amount being calculated upon his life expectancy and a percentage of his average wages for the last ten years of his service within his class. But he may under § 9 accept less during life, sharing part thereof with one nominated or selected by him under one of the options above specified.

In the case at bar there was no fund collected.   It appears from the record that this pension scheme was not put in operation in the city of Minneapolis until 1922.   Joseph LaFond contributed not a dollar thereto, nor was a single cent from his wages withheld while he worked for the city.   To put the plan into operation the law authorized the city to credit LaFond's retirement fund account with an amount of $60 per year for the 25 years he had been in service when he retired, and also with $2 per month as received from him for 15 years, on the assumption that LaFond had contributed to

the fund as if the law had been in effect (§§ 7, 11, 12). To make up this contribution that he should have made under the law had it been in effect during the 15 years, it is provided by § 11(b) that the retired pensioner may be credited by the monthly allowance he is to draw under the retirement provisions, but he can draw no money until such monthly allowances equal what he should have paid had the law been in effect during such 15 years. So in this case the board computed the monthly retirement of LaFond at $17.25 under option II and each month up to his death applied it upon the amount he should have contributed during his period of service. There was still an uncredited amount due at the time of his death.

A pensioner may have a dependent wife or child with whom he wishes to share the benefits under this law, and so the four options are given; but these options are dependent on the fact that he has elected a lesser retirement allowance during his own life than the law allows him if all allowance terminates at his death. For instance in this case, had he elected to take the monthly retirement allowance during his own life only (his life expectancy being four years), it would have been $24.12 a month; but under option II, having elected to have his wife, who was 69 years old, share it with him, the monthly allowance was reduced. The pension then was to continue for the two lives at a lesser amount each month; that is, $24.12 per month during his life was expected to equal $17.25 per month during the life of the two. However, had he elected option III, the monthly payment to him would have been greater because the monthly payment to the surviving life would be one-half of his.

It is plain from this that it would result in confusion or a recasting of the account of a pensioner if he could, as occasion might suggest, change from one option to another at the expense of the city. And so we find the law specifically provides for each of the first three options that the election of the option shall be made upon the retirement and as a part thereof. Option IV does not specify when it is to be exercised, but that can in no event be applicable here for it must be approved by the board, and in this instance the application was rejected. It may be surmised that this option

was given in order that the pensioner might share his pension with someone who had no insurable interest in his life, or perhaps when the one elected under either of the other options deceased prior to the pensioner and some good reason existed for a substitution, which the board should pass upon.

We need not determine the exact difference between option I and option II. That there is a difference is plain from the simple reading threof. This record does not make it clear what would have been LaFond's monthly pension rate had he elected to take option I. Of necessity it must have been less than $24.12 per month. From the retirement application, prepared by the board, wherein LaFond elected option II, we find an explanation of what option I means by this line in parentheses: "(That is, with return of principal less pensions paid in event of death.)" This however is immaterial, for the language is express that the option must be selected or chosen at the "time of retirement" as to either I, II, or III; and in this case LaFond chose II and must abide there. The pension fund gained because neither LaFond nor his wife reached their expectancy of life, but the reverse would have been the case had they outlived the same. The law was not framed with the intention that the retirement fund should be the loser whether or no the pensioner outlived his expectancy.

In our opinion the findings of fact do not support the conclusions of law or the judgment.

The judgment is reversed.